TRACEY BRADLEY, Plaintiff-Appellee, *v.* CATERPILLAR TRACTOR CO., Defendant-Appellant.

Fifth District   No. 78-158

Opinion filed August 31, 1979.

Burton C. Bernard, of Bernard & Davidson, of Granite City, and Thomas B. McNeill, of Mayer, Brown & Platt, of Chicago, for appellant.

Charles W. Chapman and Paul H. Lauber, both of Chapman, Chapman & Carlson, of Granite City, for appellee.

Mr. JUSTICE KUNCE delivered the opinion of the court:

A jury trial of plaintiff-appellee Tracey Bradley's personal injury action in the Circuit Court of Madison County ended in a verdict for defendant-appellant Caterpillar Tractor Company. The trial court granted the plaintiff's motion for a new trial. We then allowed the defendant's petition for leave to appeal pursuant to Supreme Court Rule 306 (Ill. Rev. Stat. 1977, ch. 110A, par. 306). The issue presented is whether the trial court's granting of the motion for a new trial was an abuse of discretion. We find that it was.

The plaintiff's action sounded in strict liability in tort. The gist of the complaint was that the absence of a rollover protective device or protective canopy on a tractor manufactured by Caterpillar rendered the product unreasonably dangerous, and that this design defect was the

proximate cause of the plaintiff's injuries. The plaintiff, a heavy equipment operator, was injured on October 26, 1973, while operating the tractor in question, which had been modified for use by welders in pipe-laying operations. The tractor as modified was referred to in the construction industry as a "Tack Cat." As a result of the accident, plaintiff claimed that he had suffered damage to his spinal cord, resulting in a limited use of his legs, a condition referred to as spastic paraplegia.

The tractor was manufactured and sold in 1956 for use as a bulldozer in the construction industry. In 1967, it was purchased by Albert Equipment Company and transformed into a Tack Cat: the bulldozer blade, hydraulic lift cylinders, winch attachments, and fenders were removed; new fenders were welded on to serve as a platform to support welding equipment; and compressors were connected to the tractor's drive shaft. The Tack Cat was leased to various companies by Albert for a period of five years, then sold to Green Construction Company, a general contractor involved in pipeline construction. Green further modified the tractor by welding on front and rear vertical steel booms and placing an overhead horizontal member on the front boom. The plaintiff was employed by Green at the time of his injuries.

Although he did not see the occurrence resulting in his injuries, the plaintiff testified that he had determined what had happened, as follows: the bolt on the front boom had broken, the boom with its horizontal structure had swiveled back toward the operator's seat and dislodged a wooden ladder hanging from the rear boom, and he had been hit by the ladder. It is undisputed that the booms, the bolt that broke, and the ladder had been added to the tractor by Green Construction Company, and were not original parts of the tractor as manufactured by Caterpillar.

Prior to trial, the court entered several *in limine* orders to the effect that certain lines of questioning not be initiated without prior leave of court. During trial, counsel for the defendant was held in contempt of court for violating the court's *in limine* orders.[1] After the jury's verdict in favor of the defendant, the plaintiff moved for a new trial, alleging that defense counsel's violations of the *in limine* orders had brought prejudicial matters before the jury and deprived the plaintiff of a fair trial. This appeal followed the trial court's order granting the motion for new trial.

■■ Courts of review will not disturb such an order unless there is an affirmative showing of a clear abuse of discretion on the part of the trial court. (*Ervin v. Sears, Roebuck & Co.* (1976), 65 Ill. 2d 140, 357 N.E.2d 500.) The reason behind this well-settled rule is the trial court's superior opportunity to observe alleged errors in the context of the trial as a whole

---

[1] We have today reversed this finding of contempt in *People v. Bernard* (1979), 75 Ill. App. 3d 786, 394 N.E.2d 819, filed simultaneously with this opinion.

and to determine whether the trial was fair to all parties and whether substantial justice was accomplished. (*Magnani v. Trogi* (1966), 70 Ill. App. 2d 216, 218 N.E.2d 21.) When, however, the evidence supports the jury's verdict and there is no showing that a party was denied a fair trial, it is an abuse of discretion for the trial court to substitute its judgment for that of the jury. (*Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 362 N.E.2d 446). As this court said in *Kitsch*:

"* * * [A] jury's verdict should not be disturbed by the trial court unless it is unreasonable, arbitrary, and unsupported by the evidence. Neither the trial court nor the appellate court should sit as a second jury to consider the nuances of the evidence or the demeanor and credibility of the witnesses. Granting a new trial merely because the trial court would have reached a different result, where there is evidence which if believed would support the jury's verdict, is an abuse of discretion. * * *" 48 Ill. App. 3d 260, 271, 362 N.E.2d 446, 454. See also *Bank of Marion v. Robert "Chick" Fritz, Inc.* (1974), 57 Ill. 2d 120, 311 N.E.2d 138; *Ervin v. Sears, Roebuck & Co.* (1976), 36 Ill. App. 3d 64, 343 N.E.2d 220, aff'd, 65 Ill. 2d 140, 357 N.E.2d 500; *Stringer v. McHugh* (1975), 31 Ill. App. 3d 720, 334 N.E.2d 311; *cf. Martinet v. International Harvester Company* (1977), 53 Ill. App. 3d 213, 368 N.E.2d 496.

Keeping these principles in mind, we will review the record in its entirety to determine, first, whether the verdict of the jury was supported by the evidence, and, second, whether the trial court was correct in concluding that the plaintiff was denied a fair trial.

The plaintiff took the stand to testify as to the circumstances surrounding the accident and the extent of his injuries. He had operated heavy equipment for more than 25 years, and had used a Tack Cat before the job on which he was injured. In essence, his job was to move the tractor where and when he was told to by the welders. The machine moved at a rate of about one-quarter mile per hour. The booms and the ladder would shake as the machine moved. The ground was level where he was working at the time he was injured. After the accident on October 26, 1973, he spent some five days at Washington County Hospital, where he was under the care of Dr. Coy. His head, shoulders, and back were bothering him at that time. In January 1974 his employer had him examined by Dr. Geise in St. Louis, and he was hospitalized at that time. Between February or March 1974, when he last saw Dr. Geise, and November 1976, when his attorney referred him to Dr. Schreiber in St. Louis, he was without medical attention. He had not had surgery on his back. He had "no feeling" in his legs and feet at the time of trial. He was able to walk with a cane if he knew where he was going. He had difficulty getting in and out of vehicles. He had told the company doctor and the

neurologist who examined him prior to his testimony at trial that his back had never bothered him before the accident.

David MacCollum, a consulting safety engineer, was called as an expert witness by the plaintiff. After an extensive recital of his background and expertise, he testified that, in connection with his employment with the U.S. Army Corps of Engineers in Oregon in the 1950s, he had conducted a study regarding protective canopies for heavy equipment. Protective canopies were available in the mid-1950s. He testified that operators of Caterpillar tractors are vulnerable to upsets and moving objects. He gave the opinion that the tractor in the case at bar, as manufactured in 1956, was unreasonably dangerous and defective because it did not incorporate rollover protection and a canopy to protect the operator from moving objects. Such protective devices, in his opinion, would have prevented the plaintiff's injury.

On cross-examination, MacCollum testified that there are dangers in the operation of such equipment even with a protective device installed. Unless all the space around the operator is enclosed, objects may intrude and injure the operator. He would allow for some hazards not being protected against because of practical considerations. In his opinion, every tractor should be equipped with seat belts. In an article he wrote about tractor canopies which was published in 1958, he did not mention the use of seat belts because the seats were not yet adaptable to belts. His article had reported that in one-third of the instances of tractor rollovers in which there was a protective device installed on the tractor, there were still deaths or injuries. Today, the devices available are better than they were in the 1950s. He took into account the hazards involved in a particular situation when he recommended in his article that canopies be provided "where overhead hazards exist" and rollover protection be provided "in areas of marked differences in elevation." His article acknowledged some unknowns, such as "the load-bearing capacity of the various designs." In his view, all tractors should have rollover protection regardless of the hazards to which they are exposed. He had worked for employers, as opposed to manufacturers, throughout his professional career.

Dr. David Schreiber, a neurologist, testified that he had examined the plaintiff in November 1976. He diagnosed a condition known as spastic paraplegia—a spastic weakness of the legs. Scoliosis and kyphosis (spinal curvature) pre-existed the accident. In his opinion, the plaintiff's neurological deficits were caused by the trauma of the accident on October 26, 1973, and the condition is permanent. On cross-examination, Dr. Schreiber testified that he had not received or considered a medical report from Dr. Coy, who treated the plaintiff immediately after the accident. His opinion was based in part on the fact that the plaintiff had

told him that he had had no prior injury or disability. A blow to the shoulder sufficient to dislocate it might or could to a reasonable degree of medical certainty cause a spinal cord compromise.

Henry Bordeaux, a senior staff engineer at Caterpillar, was called as an adverse witness by the plaintiff. He testified that Caterpillar tractors are put to a multiplicity of uses in various types of terrain, and the operators are exposed to numerous hazards. In 1956, Caterpillar made no structure for rollover protection. Today, overhead protective structures are put on all tractors except pipelayers. The type of tractor involved in this case (Model D7) was one of the first on which rollover protection was installed, because it is used extensively in logging and land clearing, the most hazardous applications. The logging canopies available in 1956 about which MacCollum had testified did not give rollover protection. Bordeaux knew of no instance in which Caterpillar had modified one of its tractors for welding purposes on pipeline jobs. Old tractors that had served out their useful lives as construction machines were good for that application, and were so modified by others.

Dr. August Geise, a neurosurgeon, testified that he had examined the plaintiff in January 1974 at the instance of the plaintiff's employer. In his opinion, the plaintiff had suffered a flexion injury which, in conjunction with the pre-existing curvature of the spine, resulted in a permanent spinal cord abnormality. The plaintiff probably would not have sustained the serious injuries he did absent the underlying scoliosis of the spine.

Charles Sanders, the equipment and purchasing manager for Green Construction Company, was the first witness called on behalf of the defendant. In 1956, he had worked for Albert Equipment Company. He had never seen a Tack Cat equipped with a rollover protective structure. Such a structure could be removed. At Green, he was responsible for the safety of employees insofar as specifications for equipment were concerned. He was familiar with the working conditions of Tack Cat operators on pipelines in Illinois, and the safety considerations involved. He did not see any significant hazards involved in operating a Tack Cat on pipelines: "Nothing overhead. Nothing to bother the operator." On cross-examination, he testified that his opinion was based on the facts that such operations take place on relatively level ground, the right of way has previously been prepared, and the pipe is level.

James Arnt, a product safety engineer for Deere & Company, a manufacturer of farm machinery, testified in behalf of the defendant concerning an article of his authorship referred to by plaintiff's witness MacCollum. Statistics and studies referred to in his article, reporting 30,000 deaths over a 50-year period as a result of tractor rollovers, involved wheeled farm tractors, not crawler tractors such as the Caterpillar bulldozers.

O. C. James, assistant to the manager of the pipeline division of Albert Equipment Company, testified as to his experience with Tack Cats, which had been in use since 1960. His company acquires old tractors, modifies them, and sells them as Tack Cats worldwide. They are not equipped with rollover protection. They are used to carry the welders and serve as a power plant for welding equipment.

The plaintiff, called as an adverse witness, testified that he had been treated by a chiropractor in St. Louis for his back for a year or so before the accident at issue. He had operated the Tack Cat for three weeks prior to his accident. He was aware that there was danger from being hit by falling objects while operating a tractor; that the tractor had no structure to protect him from moving objects; that a bolt on the front boom had broken on a prior occasion; that the ladder was hanging beside him; and that a boom might snap loose and hit him. However, he was not aware, he testified, that the ladder might be knocked off its hook and hit him. He thought there should have been a protective device on the machine. He was wearing a hard hat at the time of the accident because he was aware of the danger of being hit by falling objects.

Jim Ramsey, an operating engineer for 35 years, testified that the plaintiff had worked on a job on which Ramsey was foreman between May and July 1973, before the accident. At that time, according to Ramsey, the plaintiff was "walking with a cane. And with a shuffle like he walks today."

Ruth Taylor and Mary Kujawa, registered nurses at Washington County Hospital, where the plaintiff was treated after his accident, testified as to the treatment given him, including ice bags to the head; pain killers; ultrasound treatment to his right shoulder; whirlpool baths; and a sling for his arm.

Henry Bordeaux, senior staff engineer at Caterpillar, was recalled by the defendant. He testified that wheeled farm-type tractors have a greater propensity to roll over than crawler tractors because of their higher center of gravity. In 1956 there were some logging canopies available in the marketplace, which provided some protection against brush and limbs, and some rollover protection. However, there were no reliable rollover protective structures available, and the logging canopies themselves created certain hazards: they raised the center of gravity, increased the likelihood of a rollover, and increased the difficulty of an operator's dismounting. Caterpillar did not provide such devices on its tractors in 1956 for several reasons, including problems with metal fatigue associated with mounting the device on the tractors and the lack of an adequate restraint system for the operator. Seat belts, a necessary part of such a system, only appeared on the market about 1970. Prior to the early 1970s

Caterpillar had not developed a reliable structure that overcame all the difficulties involved.

Finally, in rebuttal, the plaintiff testified that he did not remember working on the job testified to by Ramsey. He had had no difficulty with his legs and back, and had been able to work, prior to his injury.

The court's order granting a new trial set out five reasons: four violations of the court's *in limine* orders, and one evidentiary error. The supposed instances of misconduct by defense counsel involved (1) eliciting testimony from MacCollum pertaining to safety codes in Oregon and California and regulations of the Army Corps of Engineers; (2) inquiring as to the plaintiff's prior physical condition in cross-examination of the plaintiff and Dr. Schreiber; (3) asking Bordeaux about tests of protective devices conducted by Caterpillar; and (4) arguing to the jury that the plaintiff should have sued his employer, who placed the boom and ladder on the tractor. Additionally, the court ruled that it had erred in permitting Sanders to express an expert opinion as to the hazards posed in the operation of a Tack Cat without protective structures. The court concluded that the conduct of defense counsel had deprived the plaintiff of a fair trial.

Our review of the evidence, as summarized above, reveals that there was ample evidence of record to support the jury's verdict for the defendant—and indeed the trial court did not rule to the contrary. The jury was properly instructed that the plaintiff had the burden of proving that the design and manufacture of the tractor without a rollover protective structure or protective canopy made the tractor unreasonably dangerous, and that the defective condition of the tractor was a proximate cause of the plaintiff's injuries.

■■ Resolution of the question whether a product is unreasonably dangerous for failure to incorporate safety devices is the function of the jury as trier of fact. (*Martinet v. International Harvester Co.* (1977), 53 Ill. App. 3d 213, 368 N.E.2d 496; *Neal v. Whirl Air Flow Corp.* (1976), 43 Ill. App. 3d 266, 356 N.E.2d 1173; *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 326 N.E.2d 74; *Rivera v. Rockford Machine & Tool Co.* (1971), 1 Ill. App. 3d 641, 274 N.E.2d 828.) So too is resolution of the issue of proximate cause. See the discussion by this court in *Kerns v. Engelke* (1977), 54 Ill. App. 3d 323, 369 N.E.2d 1284.

■■ The jury here had before it substantial evidence tending to prove that the design of the tractor was not unreasonably dangerous when manufactured, and further that, even if it were, the defective design was not a proximate cause of the plaintiff's injuries. The verdict for the defendant could not be said to be unreasonable, arbitrary, or unsupported by the evidence; therefore, unless defense counsel's

misconduct did deny the plaintiff a fair trial, the order granting a new trial must be reversed, and the verdict of the jury reinstated.

We will address briefly, in order, each violation cited by the trial court.[2]

1. The questions asked on cross-examination of MacCollum were entirely proper and violated neither the letter nor the spirit of the *in limine* order prohibiting mention of the fact that no government standards or codes required rollover protective structures at the time of the tractor's manufacture. It was plaintiff who elicited this witness' first mention that he had been involved in developing such safety codes and requirements, and this experience formed part of the basis for his expert opinion testimony. Defense counsel's questions were well within the realm of proper cross-examination for the purpose of testing the credibility and expertise of the witness. Only after MacCollum had volunteered that it was not until about 1966 that the Society of Automotive Engineers had begun to work on its standards, did defense counsel ask: "when you left in 1961 had the Corps developed any—." This question, left unfinished, was objected to and promptly sustained. There were no other objections to this entire line of questioning on cross-examination. In fact, on redirect, plaintiff's counsel resumed questioning the witness about when an Oregon code was first adopted. In no way could this alleged violation of the *in limine* order have prejudiced the plaintiff, or denied him a fair trial.

2. Defense counsel had been ordered not to inquire about any prior injuries suffered by the plaintiff without first laying a medical foundation to connect them with the injuries which were allegedly suffered in the accident of October 26, 1973. In attempting to connect a 1969 injury to the right shoulder to the claimed injuries, he asked Dr. Schreiber whether he had obtained a medical history from the plaintiff. An objection was sustained. Nothing was revealed to the jury by this line of questioning, which represented an attempt by defense counsel to comply with the court's (unduly restrictive) order. Nor did an impeaching question about prior chiropractic treatment asked the plaintiff serve to deny him a fair trial.[3]

3. After Bordeaux had testified that prior to the 1970s Caterpillar had not developed a reliable structure that overcame the difficulties he had explained, he was asked by defense counsel how long they had been working on those problems. An objection was promptly sustained, as was an objection to a subsequent question asking the witness to explain Caterpillar's activities in developing protective structures. The court had

---

[2] As for Sanders, we think that the record clearly reveals that he possessed the expertise necessary to give an expert opinion. See, e.g., *Harris v. City of Granite City* (1977), 52 Ill. App. 3d 782, 365 N.E.2d 1034.

[3] See the discussion of this supposed violation in *People v. Bernard.*

entered an order *in limine* prohibiting reference to testing, based on the concept that the focus in a case based on strict liability in tort is on the product, not the manufacturer's conduct. Although this questioning may well have violated the order, it conveyed nothing improper to the jury, and could not have prejudiced the plaintiff.

4. A careful reading of the defendant's opening statement reveals no basis for the finding that defense counsel stated to the jury that the plaintiff should have sued his employer.

■ To sum up, none of the alleged instances of misconduct was consequential; all of them taken together could not have prejudiced the plaintiff, or denied him a fair trial, in the context of this entire lengthy proceeding. Therefore, in view of the substantial evidence to support the jury verdict, we must reverse the order granting a new trial.

We feel constrained to add the following comment. Not only do we find a dearth of evidence that the plaintiff was prejudiced by anything brought before the jury by the defendant, we find to the contrary that defense counsel was unduly restricted in presenting a defense for his client by the incredible overbreadth of the trial court's orders *in limine*.[4] The orders effectively precluded defense counsel from attempting to persuade the jury that the design of the tractor was not the proximate cause of the plaintiff's injury—a defense clearly available in a case such as this. See, *e.g., Santiago v. Package Machinery Co.* (1970), 123 Ill. App. 2d 305, 260 N.E.2d 89; *Ostendorf v. Brewer* (1977), 51 Ill. App. 3d 1009, 367 N.E.2d 214; *Coleman v. Verson Allsteel Press Co.* (1978), 64 Ill. App. 3d 974, 382 N.E.2d 36; *Kerns v. Engelke.*

■■ As we have stated on a prior occasion, the correct use of motions *in limine* can promote jury trials devoid of prejudice. (*Department of Public Works & Buildings v. Roehrig* (1976), 45 Ill. App. 3d 189, 359 N.E.2d 752.) In the *Roehrig* case, we addressed briefly how a trial court should proceed in deciding whether to grant such a motion or to leave it to the moving party to object to inadmissible evidence offered at trial:

> "* * * [T]he circuit court should balance the prejudice that might be avoided against the complication or inconvenience that might be caused by granting the motion. When the former outweighs the latter, the motion should be granted. But when the motion requests an exclusionary order so complicated that compliance with it would be difficult for the opposing party, despite a sincere effort to comply, the motion should be denied."

(45 Ill. App. 3d 189, 195, 359 N.E.2d 752, 759.)

The instant case exemplifies exactly the kind of order *in limine* which should be avoided. As in *Turner v. Commonwealth Edison Co.* (1978), 63

---

[4] In addition, we feel, the court erred in refusing to permit the defendant to amend its pleadings to assert the defense of assumption of the risk, which had a basis in the evidence.

Ill. App. 3d 693, 380 N.E.2d 477, the erroneous order was "systemic in its impact."

■■■ In *Lewis v. Buena Vista Mutual Insurance Association* (Iowa 1971), 183 N.W.2d 198, the Supreme Court of Iowa had occasion to speak to such a case. We adopt here what that court said there:

"The motion in limine is a useful tool, but care must be exercised to avoid indiscriminate application of it lest parties be prevented from even trying to prove their contentions. That a plaintiff may have a thin case or a defendant a tenuous defense is ordinarily insufficient justification for prohibiting such party from trying to establish the contention. Nor should a party ordinarily be required to try a case or defense twice—once outside the jury's presence to satisfy the trial court of its sufficiency and then again before the jury. Moreover, the motion in limine is not ordinarily employed to choke off an entire claim or defense, as it was here * * *. Rather, it is usually used to prohibit mention of some specific matter, such as an inflammatory piece of evidence, until the admissibility of that matter has been shown out of the hearing of the jury.* * *

* * * The motion is a drastic one, preventing a party as it does from presenting his evidence in the usual way. Its use should be exceptional rather than general. * * * The motion should be used, if used at all, as a rifle and not as a shotgun, pointing out the objectionable material and showing why the material is inadmissible and prejudicial. Since no one knows exactly how the trial will proceed, trial courts would ordinarily be well advised to require an evidentiary hearing on the motion when its validity or invalidity is not manifest from the face of the motion." 183 N.W.2d 198, 200-01.

For the foregoing reasons, the order of the Circuit Court of Madison County granting a new trial is reversed, and the jury verdict is reinstated.

Reversed.

KASSERMAN and KARNS, JJ., concur.